```
 1              IN THE UNITED STATES DISTRICT COURT
           FOR THE MIDDLE DISTRICT OF NORTH CAROLINA
 2

 3  UNITED STATES OF AMERICA    )   CASE NO. 1:13CR337-1
                                )              1:14CR4-1
 4         vs.                  )
                                )   Winston-Salem, North Carolina
 5  IDER VAZQUEZ MATOS          )   May 16, 2014
    _____   2:30 p.m.
 6

 7

 8              TRANSCRIPT OF THE **SENTENCING HEARING**
             BEFORE THE HONORABLE THOMAS D. SCHROEDER
 9                  UNITED STATES DISTRICT JUDGE

10

11  APPEARANCES:

12  For the Government:        SANDRA HAIRSTON, AUSA
                               Office of the U.S. Attorney
13                             101 S. Edgeworth Street, 4th Floor
                               Greensboro, North Carolina 27401
14

15  For the Defendant:         ROBERT A. BROADIE, ESQ.
                               CAROLINA LEGAL SOLUTIONS
16                             2807 Earlham Place
                               High Point, North Carolina 27263
17

18  Court Reporter:            BRIANA NESBIT, RPR
                               Official Court Reporter
19                             P.O. Box 20991
                               Winston-Salem, North Carolina 27120
20

21  Interpreter:               DR. MARGO BENDER

22

23

24
        Proceedings recorded by mechanical stenotype reporter.
25       Transcript produced by computer-aided transcription.
```

USA v. Ider Matos –– Sentencing –– 5/16/2014

1                                 INDEX

2

3  **GOVERNMENT'S WITNESSES:**                          **PAGE:**

4

5  SPECIAL AGENT JEFFREY T. PURGASON:

6     Direct Examination by Ms. Hairston           10
      Cross-Examination by Mr. Broadie             20
7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

USA v. Ider Matos  -- Sentencing  -- 5/16/2014

P R O C E E D I N G S

(The Defendant was present.)

**THE COURT:** Ms. Hairston.

**MS. HAIRSTON:** Good afternoon, Your Honor.

**THE COURT:** Good afternoon.

**MS. HAIRSTON:** Your Honor, the next cases are the United States of America versus Ider Vazquez Matos in Case Number 1:13CR337 and 1:14CR4-1. Mr. Vazquez Matos is represented in both cases by Mr. Robert Broadie, and it was the government's intention to call them for sentencing. However, I do not see an interpreter present this afternoon.

**THE COURT:** All right.

**MS. HAIRSTON:** While Mr. Vazquez does speak some English, Your Honor, the government would not want to go forward without an interpreter.

**THE COURT:** What I was going to propose then is that we give Ms. Solomon an opportunity to see if she can locate an interpreter for us. I will just recess court, and if everybody would stand by where they can be reached momentarily. I don't know if it's going to take 2 or 3 minutes or 30 minutes to an hour, but we'll see what we can do.

**MS. HAIRSTON:** Yes, sir.

**MR. BROADIE:** Yes, sir.

**THE COURT:** We'll be in recess until further notice.

(The Court recessed at 2:31 p.m.)

USA v. Ider Matos -- Sentencing -- 5/16/2014

1    (The Court was called back to order at 3:18 p.m.)

2    (The Defendant was present.)

3         **THE COURT:**  Okay.  Do you want to call the case

4  again?

5         **MS. HAIRSTON:**  Yes, sir.  Your Honor, we will call

6  the United States of America versus Ider Vazquez Matos in Cases

7  1:13CR337-1 and 1:14CR4-1.  Mr. Vazquez is represented by

8  Mr. Robert Broadie.  The cases are called for sentencing.

9  Dr. Bender is present as the interpreter, Your Honor.

10         **THE COURT:**  Dr. Bender, good afternoon.

11         **THE INTERPRETER:**  Good afternoon.

12         **THE COURT:**  Let's go ahead and administer the oath to

13  Dr. Bender, please.

14    (The Interpreter was duly sworn.)

15         **THE COURT:**  Ms. Saunders is here, as I indicated,

16  from the probation office.  We are here today for sentencing in

17  both of these cases.

18    Mr. Broadie, did you receive a copy of the revised

19  presentence report dated March 25, 2014?

20         **MR. BROADIE:**  I have, Your Honor.

21         **THE COURT:**  Did you review that with your client?

22         **MR. BROADIE:**  I did, sir.

23         **THE COURT:**  And are you prepared for a sentencing

24  hearing today in these cases?

25         **MR. BROADIE:**  We are, Your Honor.

USA v. Ider Matos  -- Sentencing  -- 5/16/2014

1          THE COURT:  Does your client go by Vazquez or Matos?

2          MR. BROADIE:  Matos.

3          THE COURT:  All right.  Mr. Matos, I need to speak

4   with you, if you would stand for a moment, please, sir.  Good

5   afternoon.  Did you receive a copy of your written presentence

6   report, sir?

7          THE DEFENDANT:  Yes, sir.

8          THE COURT:  Did you review that with your attorney?

9          THE DEFENDANT:  Yes, we did go over it.

10          THE COURT:  Do you understand the contents of the

11   report?

12          THE DEFENDANT:  Yes, I understood it.

13          THE COURT:  All right.  Thank you.  You may have a

14   seat.

15      Now, I've read the presentence report.  I've received the

16   defendant's sentencing memorandum, Document 54; the government

17   has filed a position paper, Document 55, as well as a motion

18   for leave to file it out of time; and then there is the

19   defendant's position with respect to the presentence report,

20   Document 53.

21      First of all, do I have all the materials?

22          MS. HAIRSTON:  Yes, sir.

23          MR. BROADIE:  Yes, Your Honor.

24          THE COURT:  Now, the government has filed a late

25   response.  Any objection?

USA v. Ider Matos  —— Sentencing  —— 5/16/2014

1          **MR. BROADIE:**  No objections, Your Honor.

2          **THE COURT:**  I will grant the motion to file it out of

3    time.

4          Now, you do have some objections, it looks like, that

5    remain as to the presentence report.  Why don't you use this

6    opportunity to raise those at this time, whatever it is that's

7    remaining by way of objection.

8          **MR. BROADIE:**  Thank you, Your Honor.  Your Honor,

9    formally, I would like to first withdraw Objection Number 1

10   that the defendant filed, the objection to the drug amount

11   exceeding 15 kilograms.  Additionally, Your Honor, respectfully

12   we will withdraw the Objection Number 2, that the defendant

13   objected to all the facts alleging that he maintained 8215

14   Hinshaw Shop Road, Liberty, North Carolina, for the purposes of

15   distributing cocaine hydrochloride.

16         We will respectfully withdraw those two objections, Your

17   Honor, and remaining -- we will be standing on Objection Number

18   3, the defendant objects to all facts alleging that he was a

19   manager or supervisor and the conspiracy -- excuse me -- and

20   the criminal activity involved five or more participants or was

21   otherwise extensive.

22         Additionally, he objects to Number 4, Your Honor.  The

23   defendant objects to the failure of the probation officer to

24   recommend a two-level decrease pursuant to U.S.S.G. Section

25   5C1.2 and the eligibility of the safety valve.

        USA v. Ider Matos  -- Sentencing  -- 5/16/2014

1     And, lastly, Your Honor, the defendant objects to all

2 facts illustrating that he is in possession of the listed

3 assets and that he is receiving income from those assets and

4 that he has the ability to pay a fine and that such fine will

5 not cause undue hardship to his family.

6          **THE COURT:**  All right.  Let me start with the manager

7 or supervisor because if it turns out that he is a manager or

8 supervisor, then the safety valve, I think, becomes moot.

9          **MR. BROADIE:**  That's correct, Your Honor.

10         **THE COURT:**  So maybe that's the right place to start.

11 Ms. Hairston?

12         **MS. HAIRSTON:**  Your Honor, as we said in our position

13 paper, the defendant apparently raises just a generalized

14 objection to facts surrounding the application of the

15 adjustment for the aggravating role, and we would submit that

16 the facts contained in the offense conduct, specifically the

17 paragraphs to which we've cited, support the enhancement.

18     We do not intend, Your Honor, to present a witness -- or

19 call any witness.  The facts in the presentence report we would

20 ask the Court to consider.

21         **THE COURT:**  Well, let me ask you this:  The facts in

22 the presentence report presumably come from some investigation

23 conducted by the law enforcement officers?

24         **MS. HAIRSTON:**  Yes, sir.

25         **THE COURT:**  Are those contained in written records

USA v. Ider Matos  -- Sentencing  -- 5/16/2014

1  somewhere, investigative records?

2          MS. HAIRSTON:  Yes, sir, all of which have been

3  disclosed to the defendant during discovery, and those

4  individuals were debriefed or interviewed during the course of

5  the investigation, the two individuals who are mostly relied on

6  in the presentence report.  That would be Mr. Jesus Francisco

7  Garcia Pina, who is a co-defendant in this case, and Sabino

8  Rangel Canela, who was in a related case but not a named

9  co-conspirator in this case, Your Honor.

10         THE COURT:  All right.  Before I go any further with

11  that, Mr. Broadie, what is your position as to the government

12  simply relying on the presentence report?

13         MR. BROADIE:  Your Honor, as we stated in our

14  objection, we are objecting to the facts in the presentence

15  report that allege that my client was a manager or supervisor

16  with any of the other co-conspirators.  Our premise, Your

17  Honor, is that these statements are essentially statements that

18  were taken from other co-conspirators, indicted or otherwise,

19  that they are self-serving, that are, in our opinion,

20  contradictory, and most importantly, Your Honor, that are

21  false; and we object to the Court relying on those statements

22  as they appear in the presentence report.

23         THE COURT:  All right.  Well, there is case law that

24  says that a defendant, if he is objecting to the presentence

25  report, has an affirmative duty to make a showing that the

USA v. Ider Matos  -- Sentencing  -- 5/16/2014

information in the presentence report is unreliable and to
articulate the reasons why the facts contained therein are
untrue or inaccurate.

Without an affirmative showing the information is
inaccurate, the Court is free to adopt the findings of the
presentence report without more specific inquiry or
explanation.  The burden remains on the defendant to show the
inaccuracy or unreliability of the presentence report.  That's
*U.S. v. Terry*, 916 F.2d 157 at page 162.  That's also relied on
in *U.S. v. Love*, which is 134 F.3d 595 at 606.

On the other hand, the government has the burden of
showing any enhancement that applies.  Are there records that
are easily reviewable by me that contain this information; that
is, are there some reports somewhere that contain this
information?

**MS. HAIRSTON:**  Yes, sir.

**THE COURT:**  All right.

**MS. HAIRSTON:**  Your Honor, just briefly by way of
explanation, the witnesses -- or some of these witnesses have
already been returned to the Bureau of Prisons after the
defendant's entry of the guilty plea and objections weren't
filed initially.  And that -- I take responsibility for that
because I did not anticipate that I would need to call
witnesses at this sentencing at that given time.

We do have, Your Honor -- I have, and Mr. Broadie has seen

USA v. Ider Matos  -- Sentencing  -- 5/16/2014

1   all of these, debriefings that are referred to in the

2   presentence report.  And if I could just have a moment, Your

3   Honor?

4           **THE COURT:**  Sure.  Well, I know the practice in some

5   districts is to have -- the government puts on a case agent and

6   has them review what's in the report that contains the basis of

7   this information.

8           **MS. HAIRSTON:**  Yes, sir.  Well, Agent Purgason is

9   here.

10          **THE COURT:**  I leave that to you.  If you wish to do

11  that, then you are welcome to do that.  I am simply inquiring

12  as to the source of the information.  If it came from other

13  witnesses and it's part of the investigation, if you want to

14  put that on, I would be happy to hear that.  Then I will make a

15  determination of fact based on that.

16          **MS. HAIRSTON:**  Yes, sir.  If I could have just one

17  moment, Your Honor?

18      (Off-the-record discussion.)

19          **MS. HAIRSTON:**  Your Honor, the government will call

20  Special Agent Todd Purgason.

21  **SPECIAL AGENT JEFFREY T. PURGASON,** GOVERNMENT'S WITNESS, at

22  3:30 p.m., being first duly sworn, testified as follows:

23                      DIRECT EXAMINATION

24  **BY MS. HAIRSTON**

25  Q   Would you state your full name, please, sir.

Case 1:13-cr-00337-TDS   Document 85   Filed 09/10/14   Page 10 of 52

1  A       Jeffrey Todd Purgason.

2  Q    Mr. Purgason, how are you employed?

3  A    As a special agent with the Internal Revenue Service,

4  Criminal Investigation.

5  Q     In that regard, have you been involved in the

6  investigation of the defendant, Mr. Ider Vazquez Matos?

7  A    Yes.

8  Q    As part of your investigation, did you conduct a

9  debriefing or an interview with a person by the name of Jesus

10 Francisco Garcia Pina?

11 A    Yes.

12 Q    Mr. Garcia, or Mr. Garcia Pina, whichever you feel

13 comfortable using, was he a named co-defendant in Case Number

14 1:13CR337 with Mr. Matos?

15 A    Yes.

16 Q    What was the purpose of your interview with Mr. Garcia

17 Pina?

18 A     It was to gain an understanding as to his involvement in

19 the organization and to hear what he could possibly tell us

20 about other individuals.

21 Q     In the course of your interview with Mr. Garcia Pina, did

22 he discuss the defendant, Mr. Ider Vazquez Matos?

23 A    Yes.

24 Q    Could you summarize for the Court or state to the Court

25 the information that Mr. Garcia Pina gave you regarding

Case 1:13-cr-00337-TDS  Document 85  Filed 09/10/14  Page 11 of 52

1  Mr. Matos?

2  A    He said that he met Mr. Matos and that at some point he

3  began working for him.  I guess around 2007, 2008, Mr. Matos

4  asked him if he could help do him a favor by moving some

5  merchandise; and when we asked, you know, what does merchandise

6  mean, he stated that it was to move cocaine, that Mr. Vazquez

7  Matos was in cocaine trafficking.

8  Q    Now, initially -- or at some point did Mr. Garcia Pina

9  indicate that he and Mr. Matos were engaged in some type of,

10 for lack of a better word, legitimate business activity

11 together?

12 A    I think if I recall correctly, he helped Mr. Matos at a

13 club that he had; and then I think even after he opened up the

14 event center there at 421, he may have assisted him some there

15 as well.

16 Q    You said that Mr. Garcia Pina indicated that he was

17 approached about moving some merchandise for the defendant?

18 A    Yes.

19 Q    All right.  And what else did he tell you?

20 A    He stated that he would go to what was known as "the white

21 house," or how he called it, "the white house," which is the

22 home located on Hinshaw Shop Road.

23        THE COURT:  Can you take the microphone and bring it

24 closer to your mouth.

25        THE WITNESS:  And that he would -- the product would

USA v. Ider Matos  -- Sentencing  -- 5/16/2014

1    be there, and he would get that and distribute it to -- one

2    particular customer that he mentioned was Luis Gutierrez, and

3    that he was -- would sell or deliver cocaine to Gutierrez and

4    that he sold it for approximately $31,000.  At some point

5    Mr. Gutierrez had been fronted cocaine and had provided that to

6    a customer and, for some reason, did not get paid for about a

7    half a kilo of cocaine, and that once he, Mr. Gutierrez, came

8    to Garcia Pina and explained to him that he didn't have the

9    money and would need to set up payments, then Mr. Garcia Pina

10   put him in contact with Mr. Matos to work that out.

11   **BY MS. HAIRSTON**

12   Q    So Gutierrez was put directly in touch with the defendant;

13   is that what you are saying?

14   A    Yes.

15   Q    All right.  Now, what else did he tell you, Mr. Garcia

16   Pina, regarding his association with the defendant?

17   A    He stated that he helped transport the drugs, and he would

18   help unload at the house, the cocaine, and that at some point,

19   I think it was in 2008, his mother had passed away in Mexico.

20   So he went back to Mexico, and then at some point Mr. Garcia

21   Pina came back to the United States and started working again,

22   but, yet, his role had changed at that point.

23   Q    Whose role had changed?

24   A    Mr. Garcia Pina.

25   Q    And the person who went back to Mexico in 2008 is Garcia

Case 1:13-cr-00337-TDS   Document 85   Filed 09/10/14   Page 13 of 52

1    Pina and not the defendant?

2    A    Correct.

3    Q    Because the defendant is not a citizen -- or was not a

4    citizen of Mexico?

5    A    Correct.

6    Q    So when Mr. Garcia Pina came back, did he state when he

7    came back to the United States?

8    A    He stated it was some time after his mother's death.  I am

9    not sure.  I don't know if he could pinpoint a specific time as

10   to when he came back.

11   Q    But he used the time frame of 2008 and his mother's

12   passing as a reference point?

13   A    Correct.

14   Q    All right.  When he returned to the United States, did he

15   indicate he had further contact with the defendant?

16   A    He did, but, basically, he was helping another individual,

17   Mr. Rangel Canela, and he would kind of get, I guess,

18   directions sometime from him that had been passed on from

19   Mr. Matos.

20   Q    Now, in that regard, do you recall any specific statement

21   from Mr. Garcia Pina that he received instructions from the

22   defendant?

23   A    At the first encounter, when he approached him to see if

24   he would assist him in this -- when he first approached him

25   about it, he instructed him -- I think it was to go to the

USA v. Ider Matos  -- Sentencing  -- 5/16/2014

1  white house there on Hinshaw Shop Road and help there.

2           **THE COURT:**  Who instructed whom?

3           **THE WITNESS:**  Mr. Vazquez instructed Garcia Pina.

4  **BY MS. HAIRSTON**

5  Q    And then you say at some point a person known as Sabino

6  Rangel Canela was the person who was telling Mr. Garcia Pina

7  what to do or giving him some kind of directions; is that

8  correct?

9  A    He stated that when he first came back his role had

10 changed, and he more or less took direction from Rangel Canela,

11 and that over time that changed a little bit and that he became

12 more in favor like he was previously before he left to go to

13 Mexico.

14 Q    Now, what does that mean, "he became more in favor"?

15 A    Well, that he was relied upon, I guess, specifically as

16 opposed to getting direction from Mr. Canela.

17 Q    He was relied upon by whom?

18 A    By Mr. Vazquez.

19 Q    And did he explain for what purpose?

20 A    My recollection was that Mr. Canela was doing things that

21 Mr. Matos didn't like or -- that sort of thing.

22 Q    All right.  So during the course of your investigation and

23 your interviews of Mr. Garcia Pina and other individuals, were

24 you able to form an opinion as to the type of relationship

25 Mr. Garcia Pina had with the defendant?

Case 1:13-cr-00337-TDS   Document 85   Filed 09/10/14   Page 15 of 52

1  A     My opinion was that he worked, I guess, at Mr. Matos'

2  direction, that Mr. Matos would bring the drugs from -- he

3  would transport them into Liberty on his tractor-trailer, that

4  they would be unloaded there at the house, and Mr. Garcia Pina

5  would assist in that.  Then sometimes he would receive phone

6  calls from Mr. Vazquez that would tell him to do certain

7  things.

8  Q    All right.  Now, in the course of your investigation, you

9  also talked to mister --

10          **THE COURT:**  Let me interrupt.  I'm sorry.  You

11  mentioned Mr. Vazquez and sometimes you mentioned Mr. Matos.

12  Are you referring to the same individual?

13          **THE WITNESS:**  Yes, sir.

14          **THE COURT:**  Thank you.  I'm sorry.

15          **MS. HAIRSTON:**  Yes, sir.

16  **BY MS. HAIRSTON**

17  Q    Now, during the course of your investigation, the

18  defendant also submitted to a debriefing; is that correct?

19  A    Correct.

20  Q    And his position during his debriefing was that he was not

21  necessarily giving instructions to Mr. Garcia Pina or to

22  Mr. Rangel Canela; is that correct?

23  A    Correct.

24  Q    What was the defendant's position as far as their

25  relationship with each other?

USA v. Ider Matos  -- Sentencing  -- 5/16/2014

1  A    The defendant's position was that he basically was a

2  transporter for the cocaine and that he would bring it into the

3  Liberty area, he would take it out of his truck, place it into

4  the white house there at Hinshaw Shop Road, and that those

5  individuals conducted transactions and activity more or less

6  independent from him; and then he would go about his business

7  with his trucking business and his other businesses while he

8  was in the area.  Those individuals did what they did with the

9  drugs, selling it, collecting the money, and then he would get

10  notified to pick the money up to transport it back to

11  California.

12  Q    All right.  So as opposed to Mr. Garcia-Pina's position

13  that he was working at the defendant's direction, the

14  defendant's position was that they were all in it together, for

15  lack of a better phrase?

16  A    Well, that mister -- my understanding of the defendant's

17  position was that it was Garcia Pina and Rangel Canela had this

18  going on, and all he was was more or less the transporter.

19  Q    All right.

20  A    That they were selling this kind of not at his direction,

21  but he was just a transporter.

22  Q    So they were independent contractors?

23  A    In essence, yes.

24  Q    All right.  During the course of your interviews, everyone

25  identified that white house on Hinshaw Shop Road as the stash

Case 1:13-cr-00337-TDS  Document 85  Filed 09/10/14  Page 17 of 52

1  house; is that correct?

2  A    Correct.

3  Q    Did Mr. Garcia Pina indicate how he was being paid for any

4  activity or how he made money from this activity?

5  A    He did.

6  Q    Illegal drug activity, let me specific, the illegal drug

7  activity?

8  A    Yes.  I am trying to refresh my memory here from the

9  interview.  He stated that he was not paid a percentage or

10 anything like that.  He did state that on the first transaction

11 with Luis Gutierrez that he was paid between 5- and $6,000 and

12 that his payment -- he was inconsistently paid by Mr. Matos.

13 Q    Inconsistently paid, did he explain what he meant by that?

14 I understand what inconsistent means, but in the context of

15 this activity, what did he mean?

16 A    I think the question -- based on reading the report that

17 was written up, it may have been asked, you know, were you paid

18 a percentage of what the cost -- or the payment received was,

19 or were you paid per kilo, something to that extent; and his

20 response was he wasn't paid a percentage per kilo, that he

21 was -- that his payment was inconsistent -- that he was paid

22 inconsistently by Mr. Matos.

23 Q    All right.  Now, during the investigation, did you seize

24 what is commonly called a drug ledger or what you determined to

25 be a drug ledger?

Case 1:13-cr-00337-TDS   Document 85   Filed 09/10/14   Page 18 of 52

1  A    We found a ledger that, in reviewing it, appeared to be a

2  drug ledger, yes.

3  Q    And where was that found?

4  A    It was found on Mr. Rangel Canela when he was arrested.

5  It was in his residence at that time.

6  Q    And did you conduct an interview with Mr. Rangel Canela,

7  at least one or more interviews?

8  A    Yes.

9  Q    Was he asked about the ledger?

10 A    He was.

11 Q    What specifically was he asked about the ledger that was

12 found?

13 A    He was asked if he -- you know -- was it his, how did it

14 come into his possession, that sort of thing.  He stated that

15 Mr. Matos had been stopped on the highway in a traffic stop,

16 and that Mr. Matos and Mr. Garcia Pina were nervous because of

17 law enforcement activity at that time and that those were

18 ledgers that were provided to him.

19 Q    To --

20 A    To Rangel Canela so that Mr. Garcia Pina nor Mr. Matos

21 would be in possession of the ledgers.

22 Q    Did you go through the ledgers with Mr. Rangel Canela?

23 A    We did.

24 Q    Could you explain to the Court generally what was found in

25 the ledger?

1  A     It was a lot of dollar amounts, and it would have names

2  next to it.  Some of the names Mr. Rangel Canela identified as

3  referring to Mr. Matos and others involved in the drug

4  activity, one of them being Mr. Canela's own name, and there

5  also appeared to be -- what appeared to be maybe markings in it

6  that would refer to kilos and things of that sort of cocaine

7  possibly.

8  Q    Were there also markings that were identified as payments

9  for other work activity not associated with drug trafficking?

10  A     It appeared that way based off of what was noted.  One of

11  them that comes to mind is it had asfalto.  In asking some of

12  the individuals during the investigation, it appeared that

13  Mr. Matos may have had asphalt work done at one of his

14  businesses, and that may have been recordkeeping for that.

15            **MS. HAIRSTON:**  Thank you, Your Honor.  That's all.

16            **THE COURT:**  All right.  Any cross?

17            **MR. BROADIE:**  Thank you, Your Honor.

18                          CROSS-EXAMINATION

19  **BY MR. BROADIE**

20  Q    Special Agent Purgason, you mentioned Mr. Garcia Pina

21  stating that he was advised by -- or he was tasked by Mr. Matos

22  to do him a favor; correct?

23  A     Correct.

24  Q    Now, when was this to have occurred?

25  A     It was prior to him going to Mexico for -- before his

USA v. Ider Matos  -- Sentencing  -- 5/16/2014

1  mother passed away -- before Mr. Garcia-Pina's mother passed

2  away.

3  Q    So that would have been sometime in 2007 or 2008; correct?

4  A    Correct.

5  Q    So that was before this conspiracy that was indicted?

6  A    Before what was indicted in the conspiracy; correct.

7  Q    Now, in your interview with Mr. Pina, did you believe

8  everything that he said to you?

9  A    Like with most individuals in interviews of

10 investigations, they sometime try to minimize what their

11 involvement is, or they may not tell, you know, every detail

12 about the investigation, especially in the first interviews.

13 That's why sometimes it takes multiple interviews to get the

14 full details out of individuals.

15 Q    So is that to say that you didn't believe that he was

16 being completely truthful?

17 A    I thought for the most part, you know, he -- what he told

18 us was fairly truthful.  He seemed to be fairly candid during

19 the interview.

20 Q    Now, are there any things specific that you know not to be

21 true from his interview from the other elements of your

22 investigation?

23 A    There may be some, but I am not sure right off the top of

24 my head what comes to mind.

25 Q    So in your investigation of this case, did you make notes

USA v. Ider Matos  -- Sentencing  -- 5/16/2014

1   as to anything that you knew that Mr. Garcia was not telling

2   you the truth about?

3   A    I may have.

4   Q    Can you share that with us?

5   A    I don't have all of my files right here to look through my

6   notes.

7   Q    Is there any reason that you may have believed that

8   Mr. Garcia Pina was involved in drug activity before he knew

9   Mr. Matos?

10  A    Can you repeat that?

11  Q    Is there any reason that you have to believe that

12  Mr. Garcia Pina was involved in drug activity before he had any

13  dealings with Mr. Matos?

14  A    It's possible, but I don't know any specific thing that

15  comes to mind.

16  Q    Are you familiar with Samuel Dominguez?

17  A    No.

18  Q    You weren't involved in an investigation of Samuel

19  Dominguez?

20  A    No.

21  Q    Did Mr. Pina tell you that Mr. Matos told him to take a

22  sample of 10 kilograms to Mr. Luis Gutierrez?

23  A    Based on looking back at the report that was written,

24  Mr. Garcia Pina stated that Rangel Canela was the one who

25  tasked him to take the sample -- to go to the white house and

USA v. Ider Matos  -- Sentencing  -- 5/16/2014

1   get the sample.

2   Q    So it wasn't Mr. Matos?

3   A    Not specifically, no.

4   Q    Is there any reason that you have to believe that that is

5   not true, that Rangel Canela did not tell him to -- to tell him

6   to meet Luis Gutierrez -- strike that.

7        Did you come to know that Luis Gutierrez and Garcia Pina

8   knew each other well before Matos or even Rangel Canela were

9   involved in any of this?

10  A    No, because I wasn't involved in the investigation

11  relating to the earlier investigation that led to Mr. Luis

12  Gutierrez being arrested.

13  Q    But from this report, isn't it true that he told you that

14  the first task that he had was to take 10 kilograms to a guy

15  named Luis Gutierrez?

16  A    Can you repeat who he -- would that be referring to

17  Mr. Matos?

18  Q    Mr. Pina.  He was tasked to take 10 kilograms to someone

19  by the name of Luis Gutierrez?

20  A    Correct.

21  Q    Okay.  Did you later find out from Mr. Gutierrez --

22  Mr. Garcia Pina that he and Luis Gutierrez worked together

23  prior to this involvement at a furniture factory?

24  A    Give me one second.  If so, I don't recall it.  If it's

25  documented in here, if you could help me refresh my memory, I

USA v. Ider Matos  -- Sentencing  -- 5/16/2014

1   would be glad to look at the spot.

2           **MS. HAIRSTON:**  Your Honor, could we have one second?

3           **THE COURT:**  Yes.

4       (Off-the-record discussion.)

5   **BY MR. BROADIE**

6   Q    Strike that last question.  Were you involved in the

7   debriefing of Luis Gutierrez?

8   A    No, sir.

9   Q    Have you had an opportunity to review his statement?

10  A    I think at some point I did read it.

11  Q    Now, in his statement, do you remember him telling the

12  agents in his debriefing that he and Garcia Pina knew each

13  other prior to these events from working at the furniture

14  factory together?

15  A    I don't recall that.

16  Q    Did there come a time in the debriefing that Mr. Pina

17  advised you that he introduced Mr. Matos to Luis Gutierrez?

18  A    Yes, he did.

19  Q    And from your knowledge, that happened sometime down the

20  road; correct?

21  A    That happened -- my understanding is that happened

22  after -- what I was explaining earlier, where Mr. Gutierrez had

23  been, I guess, fronted the drugs, hadn't paid for them up

24  front, and then he distributed those and did not get paid for

25  them.  They needed to work out a payment plan.  At that point

USA v. Ider Matos  -- Sentencing  -- 5/16/2014

1  is when Mr. Gutierrez was introduced to Mr. Matos by Garcia

2  Pina.

3  Q    So at no point did Mr. Matos tell anyone to sell drugs to

4  Mr. Gutierrez; correct?

5  A    To anyone, I'm not sure about.  Not necessarily to

6  Mr. Garcia Pina based on his statements.

7  Q    To your knowledge, someone other than Mr. Matos negotiated

8  the drug transaction, the initial one?  Someone else negotiated

9  the drug transaction between Mr. Gutierrez and whomever?

10 A    Correct.

11 Q    And Mr. Matos told you that he would bring drugs to the

12 area; correct?

13 A    Correct.

14 Q    And someone else sold the drugs?

15 A    Correct.

16 Q    The example that we just gave is illustrative of such an

17 arrangement; correct?

18 A    It's an example of it, yes.

19 Q    Is there any example that you have that Mr. Matos

20 negotiated drug transactions with anybody?

21 A    There was a witness.  A Martin Caviness stated that he

22 talked to Mr. Matos in regards to drugs.

23 Q    But Mr. Caviness told you that he never talked to

24 Mr. Matos about purchasing price or anything; isn't that

25 correct?

1  A     I would have to review the memo specifically to know about

2  purchase price.

3  Q     Isn't it correct that Mr. Caviness never got drugs from

4  Mr. Matos; correct?

5  A     Actually handed to him, no.

6  Q     Okay.  Mr. Matos and Mr. Caviness never had a conversation

7  about picking drugs up from someone else?

8  A     Correct.

9  Q     Okay.  So as stated before, there is no evidence that he

10 negotiated a drug transaction with any of the people that are

11 involved in this conspiracy, did he?

12 A     Directly with individuals?

13 Q     Correct.

14 A     Not that I recall at this time, no.

15 Q     So all the evidence appears that he would bring drugs into

16 this area admittedly; correct?

17 A     He admitted that; correct.

18 Q     And someone else was selling the drugs; correct?

19 A     Correct.  They would be the ones actually distributing it.

20 Q     So is there any evidence anywhere that he told --

21        **THE COURT:**  You need to use names and not pronouns.

22 **BY MR. BROADIE**

23 Q     Is there any evidence anywhere that Mr. Matos directed any

24 of these co-conspirators other than their testimony?

25 A     Other than their testimony, not that I can recall, no.

USA v. Ider Matos  -- Sentencing  -- 5/16/2014

1  Q    Is there any evidence that Mr. Matos arranged for a

2  transaction and ordered someone else to go deliver or carry out

3  the transaction?

4  A    Based on other witnesses' testimonies, there is.

5  Q    Okay.  Now -- and the other witnesses would be the people

6  that we are speaking of; correct?

7  A    That would be Mr. Rangel Canela and Mr. Garcia Pina.

8  Q    Is there evidence that Mr. Rangel Canela or Mr. Garcia

9  Pina negotiated drug transactions with other people?

10  A    Other than testimony, no.

11  Q    Well, there was surveillance of one occasion, correct, of

12  Mr. Canela making a transaction with Mr. Gutierrez; correct?

13  A    If there was, I'm not -- let me think about this.  I'm

14  sorry.  You are right.  There was Mr. Canela going to

15  Mr. Gutierrez's place; correct.

16  Q    And that's consistent with what Mr. Matos told you;

17  correct?

18  A    That Mr. Canela would distribute the cocaine.

19  Q    That Mr. Canela would provide his own buyers for the

20  cocaine?

21  A    Yes.

22  Q    And it's consistent with what Mr. Matos told you, that

23  Mr. Garcia Pina would provide his own buyers for the cocaine?

24  A    Similar, yes.

25         **MR. BROADIE:**  No further questions, Your Honor.

USA v. Ider Matos  -- Sentencing  -- 5/16/2014

1          **THE COURT:**  Any redirect?

2          **MS. HAIRSTON:**  No, sir.  Thank you.

3          **THE COURT:**  You may step down.

4      (At 4:00 p.m., the witness was excused.)

5          **THE COURT:**  All right.  Ms. Hairston, did you have

6  any further evidence you wanted to produce?

7          **MS. HAIRSTON:**  No, sir, Your Honor.  Just briefly in

8  response to the defendant's objections, like most of these

9  cases where you have multiple defendant cases and there is a

10  conspiracy, nobody wants to be the leader; nobody wants to be

11  in charge.

12      Here, the defendant's position is that basically they were

13  all in it together.  He transported the drugs from the West

14  Coast, took money back to the West Coast.  The drugs were

15  delivered to the stash house there at Hinshaw Shop Road, the

16  place they called "the white house," and Garcia Pina, Rangel

17  Canela would go there, pick up the drugs, and then distribute

18  them to customers; and he just disputes that he gave them any

19  direction in that regard.  They say that they were working at

20  his direction.

21      Those are the facts, Your Honor, and, obviously, the Court

22  will make a determination as to whether the adjustment is

23  appropriate.  I will say that I understand that it doesn't give

24  the Court a lot to go on without the witnesses being here.

25  However, in a situation where the defendant is the one who --

USA v. Ider Matos  -- Sentencing  -- 5/16/2014

1  the person who is bringing the cocaine back to the stash house,

2  and then the individuals have indicated during their debriefing

3  that the cocaine was being delivered, it stands to reason that

4  the person who is bringing the drugs back in is not necessarily

5  going to negotiate the deals with the customers. That's not

6  odd or out of the ordinary for most drug conspiracies. So we

7  would tender that evidence to the Court.

8     I think the probation officer, based on the information

9  that was contained in the discovery and in the information that

10  was provided, made the right call in putting the adjustment in

11  the presentence report, but we'll leave it to the Court's

12  discretion to make the final determination.

13       **THE COURT:** Okay. What do you contend the evidence

14  shows based on Special Agent Purgason's testimony?

15       **MS. HAIRSTON:** I think the agent testified that

16  Mr. Garcia Pina indicated that he was being instructed -- or

17  had been instructed by the defendant to make delivery -- at

18  least a delivery of cocaine to a customer. Now, of course,

19  then the -- his statement goes to the point where he and Rangel

20  Canela were communicating with each other.

21       **THE COURT:** He whom?

22       **MS. HAIRSTON:** I'm sorry. Mr. Garcia-Pina's

23  statement goes that he and Mr. Rangel Canela were communicating

24  with each other for the distribution of drugs that had been

25  brought in by the defendant. So that, Your Honor, obviously,

USA v. Ider Matos -- Sentencing -- 5/16/2014

1  the Court can consider as to whether or not the defendant was

2  actually instructing both of them, one of them, or neither of

3  them at that point.

4          **THE COURT:**  Say that again.

5          **MS. HAIRSTON:**  I said the Court then -- those facts

6  then --

7          **THE COURT:**  Which facts?

8          **MS. HAIRSTON:**  The facts where Mr. Garcia Pina and

9  Mr. Rangel Canela appear to be together in deciding where drugs

10 were going to be supplied or which customers were going to be

11 supplied with the drugs, because the defendant's argument is

12 that once he brought the drugs in, and the agent, in his

13 testimony -- that's the reason I asked him about the

14 defendant's interview, Your Honor, so the Court would have all

15 sides.

16     The defendant during his debriefing indicated that while

17 he admits that he brought the drugs in, he admits that he took

18 the money back out, once the drugs got to the stash house, he

19 wasn't telling them to whom to sell.  He simply said they are

20 here, and Mr. Garcia Pina and Mr. Rangel Canela then would come

21 and get the drugs, sell to the customers, bring the money back.

22 He then transported the money back.

23         **THE COURT:**  And the defendant argues, based on the

24 examination, that that's based in part on the fact that

25 Mr. Pina and Mr. Gutierrez currently had a preexisting

USA v. Ider Matos  -- Sentencing  -- 5/16/2014

1  relationship?

2          **MS. HAIRSTON:** Right. Luis Gutierrez was prosecuted

3  previously. It was actually his prosecution and arrest that

4  started the investigation into these other individuals. A

5  number of other individuals have been prosecuted previously.

6  He -- Mr. Gutierrez, in his debriefing, identified the

7  defendant, Sabino Rangel Canela, and a number of other

8  individuals who were involved in the drug trafficking business.

9  Some of the other individuals were prosecuted long before

10 Mr. Vazquez Matos and the individuals in this case.

11     In Mr. Luis Gutierrez's debriefing, he did state that he

12 and Mr. Garcia Pina knew each previously because they had

13 worked together at a furniture factory, and that is a fact that

14 the government would ask the Court to take into consideration,

15 that he did say that in his debriefing.

16         **THE COURT:** As I understand it, the defendant had

17 been working with the DEA at one point and then --

18         **MS. HAIRSTON:** Well, that's what the defendant says,

19 Your Honor. I can't seem to locate the person with whom he was

20 working. The agents here in this district -- there may have

21 been some local officers in Chatham County, Randolph County, in

22 one of those counties, but I cannot locate a specific DEA agent

23 in this district who was receiving information from Mr. Vazquez

24 Matos prior to the debriefing we conducted in this case.

25         **THE COURT:** Okay. Yes, sir.

USA v. Ider Matos -- Sentencing -- 5/16/2014

1    **MR. BROADIE:** Your Honor, in regards to the

2  cooperation that Mr. Matos was giving to the DEA prior to this

3  incident, I specifically spoke with one of the agents in

4  regards to this case, and I think -- and they were aware or had

5  some knowledge of Mr. Matos' investigatory efforts prior to

6  this investigation.  I did not want to make that accusation or

7  that pronouncement to the Court without some level of

8  confirmation.  Now, I do believe that the individuals that were

9  involved in his assistance have since retired or are no

10  longer --

11    **THE COURT:** Assuming for a moment there was some

12  assistance and then, as I understand the story, the defendant

13  got too close to the people involved and himself engaged in

14  drug trafficking, at that point in time, who was he working

15  with?  Who was the defendant working with when he began drug

16  trafficking?

17    **MR. BROADIE:** Well, the story goes like this, Your

18  Honor:  Mr. Matos --

19    **THE COURT:** I would like, if I can, the short

20  version.  If I need more information, I will ask questions.

21    **MR. BROADIE:** Mr. Matos operated a truck company.  He

22  had been tasked by drug dealers to make transactions back and

23  forth to California, not necessarily drug transactions.  They

24  started off with a boat.  Then there was some TVs, but we later

25  assumed that money was being packaged in these things.

USA v. Ider Matos -- Sentencing -- 5/16/2014

1        THE COURT:  So who was he working for?

2        MR. BROADIE:  Well, the name is in the presentence

3  report, Your Honor, and, respectfully, we will ask the Court to

4  not require him to verbally pronounce the individual's name.

5        THE COURT:  All right.

6        MR. BROADIE:  So at that point there came a time

7  where the individual was placed in custody and that same

8  individual asked Mr. Matos to take moneys to get the individual

9  out of jail.  Mr. Matos did not do that.  He kept the money,

10  and some time later, approximately a year later, he was ordered

11  to pay the money back.  That's what led to the transactions.

12        THE COURT:  As a way of earning his payback?

13        MR. BROADIE:  Exactly.  As that happened, he met and

14  befriended at that same time Mr. Garcia Pina, who was friends

15  with Mr. Matos, close friends, and associates in legitimate

16  business.  Mr. Matos told Mr. Garcia about his plight.

17  Mr. Garcia tells Mr. Matos, if you can get X, Y, Z, we can make

18  A, B, C.  That's what he starts doing.

19        THE COURT:  So your version is that they had this

20  preexisting -- that Pina and Canela had a preexisting drug

21  distribution network and that Mr. Matos got involved as a way

22  of earning back the $100,000 that he owed?

23        MR. BROADIE:  My position is that they were involved

24  in some levels of cocaine distribution before he got involved

25  in it; that's correct.

USA v. Ider Matos  -- Sentencing  -- 5/16/2014

1     **THE COURT:**  And that the defendant came in to work

2   off his debt and also -- well, rather, in doing that, was

3   delivering shipments to Pina and Canela?

4     **MR. BROADIE:**  No.  He was not delivering to them --

5   oh, yes.

6     **THE COURT:**  He was delivering them to the white

7   house --

8     **MR. BROADIE:**  Exactly.

9     **THE COURT:**  -- and they would then get it from the

10  white house and give it to Gutierrez and others?

11    **MR. BROADIE:**  Yes.  Respectfully, Your Honor, we

12  would even go a step further and agree with Ms. Hairston, that

13  they were working together.  There is no dispute about that

14  that was the arrangement.  You guys have the connections to

15  sell it.  I'll bring it here.  You sell it.  We take the money

16  back, and we all just move forward from there.

17      The position that we are contesting, Your Honor, is that

18  they are now asserting that he was ordering them to do these

19  things and the evidence is quite contrary to that.

20      Now, Your Honor, we also want to make clear to the Court

21  that my position on the objections -- I do apologize to the

22  Court if I missed the law, and I was not aware and I did not

23  follow the nature of the objection, showing that the facts

24  inside the presentence report were flawed in some kind of way.

25  It's been my previous practice to object to factual elements in

USA v. Ider Matos  -- Sentencing  -- 5/16/2014

1 that fashion.

2     However, there are so many little small tidbits of

3 inconsistencies that it would have been quite lengthy to go

4 through everything that we thought was controverted in this

5 presentence report or in the debriefings of the other

6 individuals.

7     So it was my intention to file the objection as I did with

8 the thought process that the government would provide whatever

9 witnesses they felt were compelling to illustrate that the role

10 adjustment was proper.  So from that regard, Your Honor, that

11 is my mistake, for lack of a better term, in terms of the

12 nature in which I objected, but that was my position, that

13 there was just so many small inconsistencies in the fact

14 pattern.

15     I would like to say this, Your Honor:  When we were

16 entering the guilty plea in this matter, that's one of the

17 reasons why we don't have a factual basis was because there

18 were so many disagreements in the nature of how things were

19 going that my client did not feel comfortable agreeing to the

20 factual basis as they were written, thus, the nature of the

21 request for the Court to find the factual basis -- in my

22 opinion, I thought we would be doing it through the testimony

23 of the witnesses.

24         **THE COURT:**  All right.  Thank you.  Give me just a

25 minute, and then I may have some more questions.

USA v. Ider Matos  -- Sentencing  -- 5/16/2014

1    (Pause in the proceedings.)

2    So according to Special Agent Purgason, who conducted the

3 debriefing, Mr. Pina claims that he helped Mr. Canela based on

4 directions that came from the defendant.  Is that your

5 understanding?

6          **MS. HAIRSTON:**  Yes, sir.

7          **THE COURT:**  Is there a question of semantics here or

8 not?  In other words, if the defendant is bringing drugs in a

9 tractor-trailer and says I have them here and tells Pina and

10 Canela, okay, I need help unloading the trailer, or whatever,

11 is there a question of whether he is directing that individual

12 by doing that, or is there a question of whether the defendant

13 simply is saying, I did my part, you need to go do your part?

14          **MS. HAIRSTON:**  Yes, sir.  I think it probably is

15 especially -- depending on which person you interview.  From

16 Garcia-Pina's perspective and Canela's perspective, they are

17 being directed.  From the defendant's perspective, he is not

18 directing them.  And, again, it's not uncommon in cases like

19 this where you have the person responsible for the drugs being

20 brought in --

21          **THE COURT:**  I understand.  Everybody is in charge

22 until they get caught and then nobody is in charge.

23          **MS. HAIRSTON:**  Nobody wants a role adjustment because

24 of the situation we find ourselves in here.  Without a role

25 adjustment, the Court could consider a safety valve adjustment

           USA v. Ider Matos  -- Sentencing  -- 5/16/2014

1 here, and with it, that can't be considered.

2     So I think it is. It's depending upon -- it's a matter of

3 perspective in who is being interviewed, Your Honor.

4       **THE COURT:** Well, I want to go a little bit deeper

5 than that because if Mr. Pina is to be believed, and he says

6 that he helped Mr. Canela based on directions that he

7 understood came from the defendant, are those directions -- is

8 the defendant directing them to do something, or is the

9 defendant saying, I've now brought the drugs here, you need to

10 come unload them if they are yours?

11       **MS. HAIRSTON:** Your Honor, I think this adjustment in

12 the spirit of guidelines is intended to apply to someone who

13 actually is in charge. That's why it's a manager, supervisor,

14 leader, or organizer of criminal activity involving five or

15 more individuals or is otherwise extensive.

16     Here, we have five or more individuals involved, and the

17 criminal activity in the alternative is otherwise extensive.

18 The question just becomes whether this defendant is in some

19 kind of supervisory role -- managerial or supervisory role.

20 They say that he made -- Mr. Garcia Pina and Canela say that

21 they got some directions from him to go deliver something. The

22 defendant says he brought the drugs and said the drugs were

23 here, and they had customers to whom the drugs were

24 distributed.

25     And that is the evidence. If I had called those witnesses

USA v. Ider Matos -- Sentencing -- 5/16/2014

1 today, Your Honor, that's the same evidence that the Court

2 would hear.  So coming from Agent Purgason or coming from the

3 witnesses themselves, they are going to say the same thing, and

4 the defendant is going to say the same thing.  He is going to

5 say, I did those things, but I didn't tell them what to do with

6 the drugs once the drugs got here.

7      **THE COURT:**  Was the defendant doing more than just

8 working off his 100,000-dollar debt?

9      **MS. HAIRSTON:**  Well, at some point the government's

10 position would be that he was, Your Honor.  The debt may have

11 been how it started, but according to the witnesses --

12      **THE COURT:**  Because the defendant's position would

13 have some persuasive authority, at least to me, to the extent

14 that he is simply trying to work off some kind of debt.  So he

15 is answering to a third party, and so he is not directing

16 anybody to do anything perhaps; the defendant is simply

17 complying with his obligation, and then he is out of there.

18   Once that's done, the persuasiveness of simply working off

19 a debt and being compliant to some third party might lose its

20 effect, and now the defendant is running some kind of

21 operation -- or not running.  I should be more accurate.  He

22 might be supervising or managing somebody.

23      **MR. BROADIE:**  Your Honor, two things to that.  One of

24 the things I want to tell the Court is that one of the reasons

25 why we are requesting the testimony of the witnesses is because

USA v. Ider Matos  -- Sentencing  -- 5/16/2014

1    of the inconsistencies.  Although Garcia Pina would say that he
2    was introduced and instructed by Canela, Canela would say that
3    he was introduced and instructed by Pina.
4         The truth of the matter is Mr. Matos would say that he and
5    Mr. Garcia Pina knew each other from about 1998, and the
6    evidence shows that, and that he and Mr. Matos and Pina
7    developed a relationship that was previous to drug dealings, a
8    friendship, a relationship and a business.
9         So with that being said, Mr. Pina -- and they all state
10   that at some point in time in early 2010 or late 2009, all of
11   this activity stopped, which is consistent with what he is
12   saying; that once he was finished, he was finished.  All the
13   testimony says they don't know why.  The supply just got cut
14   off.
15        So to Your Honor's point, that is consistent with what the
16   evidence is, is that there came a point abruptly that the
17   source stopped coming from California, and that is consistent
18   with what Mr. Matos has said the whole time.
19        Now, with his activity and his involvement, he met people,
20   he started knowing people, and people became more acquainted
21   with him and wanted him to do things, which he was debriefed
22   about, but at no point did he deny any of that.
23        And I would go a little step further, Your Honor, is that
24   making the transactions and the runs was one way of paying this
25   debt off, but it was Mr. Garcia Pina that told him that if you

         USA v. Ider Matos  -- Sentencing  -- 5/16/2014

1 can get some cocaine, I can move it, and that's how he started

2 moving the actual distribution of cocaine.

3      There is testimony that he was using cocaine, Your Honor,

4 so -- but for them to now say that he was directing them, he

5 knew nothing about distribution of cocaine.

6           **THE COURT:**  Well, he doesn't have to direct many

7 people.  I think he only has to direct one.

8           **MR. BROADIE:**  Well, I'm saying the individuals that

9 are saying that he was directing them -- Mr. Matos knew nothing

10 about distribution of cocaine, but there is evidence that

11 Mr. Garcia -- Mr. Garcia Pina did.

12           **THE COURT:**  Where did the money flow?

13           **MR. BROADIE:**  That's another point, Your Honor.  This

14 man has been alleged to have used the money for this business,

15 421 Havana.  That's one of the businesses that he and

16 Mr. Garcia Pina was the manager of.  That is where the

17 allegation of where the money flowed in, but we would contend

18 that those moneys went through multiple streams.  The main

19 supplier got his.  He did profit some from it.  So did Rangel

20 Canela and so did Garcia Pina.

21           **THE COURT:**  When the defendant got paid, who was

22 paying him?

23           **MR. BROADIE:**  Well, what would happen is that when

24 the money got back, those individuals --

25           **THE COURT:**  After Gutierrez sold --

USA v. Ider Matos  -- Sentencing  -- 5/16/2014

1          **MR. BROADIE:** They would bring the money back. He

2  would take what he owed for the drugs to the supplier and keep

3  what's left. Everybody would put a little bit of mark-up on

4  whoever they were distributing it to. That's how it happened,

5  which is consistent with how it happened.

6          **THE COURT:** Did you want to add anything else?

7          **MS. HAIRSTON:** No, sir.

8          **THE COURT:** I am going to take a break for about ten

9  minutes, and then we'll see where we are going to go. How far

10  did your agent come from to be here?

11          **MS. HAIRSTON:** He is local.

12          **THE COURT:** Okay. Let's take a 10-minute break, and

13  then I'll be right back.

14      (The Court recessed at 4:22 p.m.)

15      (The Court was called back to order at 4:37 p.m.)

16      (The Defendant was present.)

17          **THE COURT:** There is a portion of the PSR, paragraph

18  29, that says that Pina also said that he and a Misael Vazquez,

19  that's the defendant's half-brother, were assigned the task of

20  constructing a hidden compartment beneath the stairs of a

21  residence. Is that being objected to?

22          **MR. BROADIE:** Yes, Your Honor, if he is alleging that

23  my client instructed him to put it there.

24          **THE COURT:** Well, that's my question --

25          **MR. BROADIE:** Yes, Your Honor.

USA v. Ider Matos  --  Sentencing  --  5/16/2014

1          **THE COURT:**  -- is who directed Pina and Vazquez to

2    build that hidden compartment?  Do we know?

3          **MR. BROADIE:**  Your Honor, respectfully, we've had

4    this conversation about this Misael Matos Vazquez, and my

5    client doesn't even know who that is.  He's advised the agents

6    that he doesn't know who that person is or if they even exist;

7    but we will say that there was such a place put in the carpet,

8    but my client will argue that it was put there by Garcia Pina

9    as a means to help facilitate the place to store the

10   contraband.

11         **THE COURT:**  Let me ask the government.  Do you know,

12   Ms. Hairston, where that source of information comes from?

13         **MS. HAIRSTON:**  Your Honor, I think -- my recollection

14   is that it does come from -- it did come from Mr. Garcia-Pina's

15   debriefing and that the name of the individual -- Mr. Vazquez

16   Matos did tell us during his debriefing that that was not his

17   brother's name.

18         **THE COURT:**  My concern is it's not clear to me from

19   paragraph 29 who allegedly directed the creation of the hidden

20   compartment.

21         **MS. HAIRSTON:**  Your Honor, could I just show

22   something to Mr. Broadie?

23         **THE COURT:**  Yes.

24       (Pause in the proceedings.)

25         **MS. HAIRSTON:**  Your Honor, what we were looking at

USA v. Ider Matos  -- Sentencing  -- 5/16/2014

1  was -- and Agent Purgason recalled from the defendant's

2  debriefing that the defendant knew that the compartment was

3  there and that it was he who had directed Mr. Garcia Pina to

4  install it.

5      However, Mr. Broadie says that his recollection from the

6  debriefing was that the defendant admitted he knew it was

7  there, that it was installed by Mr. Garcia Pina, but that the

8  defendant did not direct Mr. Garcia Pina to construct the

9  compartment.

10     Again, it's a question -- as the Court has already pointed

11 out, it's semantics as to whose idea it was to install the

12 compartment under the stairs.

13          **THE COURT:**  I don't want to have to take any

14 testimony from the two of you.

15          **MS. HAIRSTON:**  I understand, and I am not trying -- I

16 really am not trying to testify, Your Honor.  I am simply --

17 that's why I wanted to point that out to Mr. Broadie.

18          **THE COURT:**  Is there an independent agent's report

19 that --

20          **MS. HAIRSTON:**  Well, this is --

21          **THE COURT:**  -- attributes that to the defendant?

22          **MS. HAIRSTON:**  Yes, sir.

23          **THE COURT:**  Can I see that?

24          **MS. HAIRSTON:**  Yes, sir.  It's in paragraph 14, Your

25 Honor.

USA v. Ider Matos  -- Sentencing  -- 5/16/2014

1      (Pause in the proceedings.)

2              **THE COURT:**  Who owned the Hinshaw Shop Road property?

3              **MS. HAIRSTON:**  The defendant.

4              **THE COURT:**  And the hidden compartment was in that

5   property?

6              **MS. HAIRSTON:**  Yes, sir.

7              **THE COURT:**  Do you agree with that?

8              **MR. BROADIE:**  Yes, Your Honor.

9              **THE COURT:**  Not good facts for the defendant.

10              **MR. BROADIE:**  No, Your Honor.  Your Honor, I would

11  like to tell the Court that my client gave the keys to the --

12  or offered the keys to the agents, but, Your Honor, the case is

13  that these two individuals have a relationship to where I was

14  explaining to Ms. Sandra Hairston that if Garcia thought it was

15  a good idea to do something, or any of them, it would just

16  happen.  He was not instructing, as is written in here, Your

17  Honor.  My client -- I was at the debriefing.  He advised the

18  agents that there was such a place inside of that residence in

19  his attempts to be as truthful as possible.

20      Now, Your Honor, I will tell the Court that he gave this

21  under the guise of immunity and that he gave this information

22  in total honesty pursuant to his immunity agreement, and he had

23  no reason, no reason to withhold any facts, and he doesn't have

24  any reason to withhold any facts now.  If his words were taken

25  out of context at that time, he is telling the Court and he has

USA v. Ider Matos  -- Sentencing  -- 5/16/2014

1 told these agents and he has told me that the nature of the

2 arrangement was the way it was.

3      So we would object --

4           **THE COURT:**  So you are saying that Pina gave this

5 with an immunity --

6           **MR. BROADIE:**  No, my client.

7           **MS. HAIRSTON:**  Your Honor, that particular interview

8 that the Court has is the one I was referring to from the

9 defendant.  Mr. Garcia-Pina's debriefing --

10           **THE COURT:**  Is this usable?

11           **MS. HAIRSTON:**  Your Honor, well, there are certain

12 parts of his agreement that allows the government to use it if

13 he's says something contrary to what he's already told the

14 agents, and that was what I was pointing out to the Court is

15 that in that interview he indicated -- or the interview

16 indicated that the defendant had given directions for the

17 installation of the compartment.  He now says that that's not

18 what he said during the interview.  That was the only reason

19 that I was submitting that to the Court.  We were not trying to

20 compromise the agreement -- or the government wasn't trying to

21 violate the agreement.  We were simply responding because that

22 is contrary to what he said at the time of the debriefing.

23           **THE COURT:**  Do you have a statement from Mr. Pina

24 that says that he was directed to build the hidden compartment

25 by the defendant so that this immunity question is moot?

        USA v. Ider Matos  -- Sentencing  -- 5/16/2014

1          MS. HAIRSTON:  Yes, sir.  If I can have just one

2    second to look at Mr. Garcia-Pina's statement?

3          THE COURT:  Sure.

4          MS. HAIRSTON:  Yes, sir, Your Honor.

5          THE COURT:  Whose report is that, Ms. Hairston?

6          MS. HAIRSTON:  Your Honor, this is Mr. Garcia-Pina's

7    debriefing.

8          THE COURT:  Is there just one of them?

9          MS. HAIRSTON:  Yes, sir.

10          THE COURT:  When was that conducted?

11          MS. HAIRSTON:  This was conducted October 29, 2013,

12    Your Honor.

13          THE COURT:  All right.  What paragraph?

14          MS. HAIRSTON:  Paragraph 5.

15          THE COURT:  All right.  Can I see that, please?

16          MS. HAIRSTON:  Your Honor, the name -- as I stated,

17    that name is incorrect.  I think -- my recollection from the

18    agents was that during the debriefing that person was described

19    as the defendant's brother or a relative, and the agent

20    attached the name, trying to put together who the other person

21    was.  That's how the name Misael -- I think it's in the

22    presentence report, a half-brother, identified as M-I-S-A-E-L.

23    That's how that name became part of the --

24          THE COURT:  Okay.  I tell you what I would like to do

25    at some disappointment perhaps to the parties.  This is an

USA v. Ider Matos  -- Sentencing  -- 5/16/2014

1 important issue because it affects not only the enhancement but

2 it also, if I were to find the enhancement, precludes the

3 finding of the safety valve. So it's a five-level swing either

4 way.

5     So I think what I want to do is I am going to stop here.

6 I am going to go back and look at the transcript from Special

7 Agent Ferguson.

8         **MS. HAIRSTON:** And, Your Honor, if I could just make

9 sure, it's Purgason with a P, P-U-R-G-A-S-O-N.

10         **THE COURT:** Thank you. And I may also look at the

11 underlying reports that the probation officer used for the

12 preparation of the presentence report and then determine from

13 there whether I can make any findings of fact and, if so, which

14 way I would find.

15         **MS. HAIRSTON:** Yes, sir.

16         **THE COURT:** The defendant's argument is this is all

17 consistent with simply the defendant being a deliverer and not

18 working for -- or directing anybody else. I want to determine

19 whether there are facts that -- whether the government has

20 carried its burden on the facts.

21         **MR. BROADIE:** Your Honor, I would like the

22 opportunity, if can, and relating to what the Court mentioned

23 at the beginning of this hearing -- the Court doesn't have all

24 of the other debriefings that illustrate the various levels of

25 inconsistencies and reasons to find that these words that these

    USA v. Ider Matos -- Sentencing -- 5/16/2014

1  other co-conspirators are saying are unreliable, and if the

2  Court would be enhanced by -- I would like the opportunity to

3  provide the Court something with that.  I have a ton of

4  paperwork that I would love to have the opportunity to show the

5  reasons why the Court should evaluate these testimonies.

6        **THE COURT:**  Well, let me ask this.  We had the

7  opportunity to do all that today, and we didn't do any of that

8  from -- by way of preparation, but I am going to continue this

9  to another day.  Does it make sense to have both parties

10 present what they believe the reports show for their position

11 on the issue?

12     You know what you are looking for in the reports.  That

13 might be a more productive way than my having the probation

14 officer go back through everything and pull the original

15 reports, and I can review those, because I understand there are

16 a lot of reports in this case.

17     Would you be interested in, if I reset this, each have an

18 opportunity to pull the reports?  You could attach what you

19 want to support those portions of the objection and of the

20 burden the government has.  Are you interested in doing that?

21       **MS. HAIRSTON:**  That's fine with the government, Your

22 Honor.

23       **THE COURT:**  And you want an opportunity to respond?

24       **MR. BROADIE:**  Yes, Your Honor.

25       **THE COURT:**  Okay.  All right.  What I am going to do

USA v. Ider Matos  -- Sentencing  -- 5/16/2014

1  is continue it with the -- what I would like to have you all do

2  is address the factual positions you are raising in a brief,

3  attach the actual portions of the reports that you rely upon.

4  I am hoping that's not going to be a huge volume of materials

5  when it gets down to it, but it will be whatever it is, and

6  also address the issue of whether for some reason -- if there

7  is any concern about my ability to rely on those reports at

8  this stage, the case law on that.

9      My understanding is I can rely on those reports and make

10 findings on them if I believe them to be reliable.  It's

11 hearsay, but I can rely on hearsay if I make certain findings.

12     I think it might be more productive to have the government

13 file its brief first and then give the defendant a week or so

14 to respond so that it will help narrow the discussion rather

15 than to have you both do a shotgun approach.

16     So let me get a date from Ms. Solomon, and then we'll go

17 forward.

18     (Off-the-record discussion.)

19     All right.  What if I move this to June 12?  Does that

20 work with your calendar?

21          **MR. BROADIE:**  Yes, Your Honor.

22          **MS. HAIRSTON:**  Yes, sir.

23          **THE COURT:**  So 2:00 in the afternoon, June 12.  I

24 have sentencings that day, but I only have one other in the

25 afternoon, so we should be able to pick up -- as long as I can

USA v. Ider Matos  -- Sentencing  -- 5/16/2014

1   read things in advance, maybe I can move it along.

2        So the government needs to file its supporting

3   information -- can you file it by the 28th of May?  Is that

4   possible?

5             MS. HAIRSTON:  Yes, sir.

6             THE COURT:  All right.  Why don't you file it the

7   28th, and then if you file yours by June 4th, a week later.

8             MR. BROADIE:  Your Honor, I will be out of the

9   country from the 30th through the 3d.  If I could have until

10  the end of the week, maybe the 6th?

11            THE COURT:  The 6th, okay.  How about filing it by

12  the 6th?

13       Now, you can go ahead and start on it because you already

14  know what you are looking for, or have somebody in your office

15  start on it.  File it by the end of the day on the 6th, and

16  then we'll have a hearing on the 12th at 2:00 in the afternoon.

17       Again, the idea is I think I independently can be looking

18  at what the probation officer relied upon for preparation of

19  the report.  I am not convinced that the defendant has come

20  forward with evidence to show that what's in the report is

21  unreliable; but rather than to have me go through the report

22  and independently try to determine from the underlying reports

23  for the PSR when information is relevant, I think it is better

24  if you all do that and articulate your positions, and I'll pick

25  up where we go from there.

USA v. Ider Matos  -- Sentencing  -- 5/16/2014

1      Everybody with me on that?

2          **MS. HAIRSTON:**  Yes, sir.

3          **MR. BROADIE:**  Yes, sir.

4          **THE COURT:**  Thank you all.  I am sorry we didn't get

5  finished today, but it's an important issue.  We'll be in

6  recess.

7      (END OF PROCEEDINGS AT 4:57 P.M.)

8

9                          ******

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

USA v. Ider Matos  -- Sentencing  -- 5/16/2014

1  UNITED STATES DISTRICT COURT

2  MIDDLE DISTRICT OF NORTH CAROLINA

3  CERTIFICATE OF REPORTER

4

5

6         I,  Briana L. Nesbit, Official Court Reporter,

7  certify that the foregoing transcript is a true and correct

8  transcript of the proceedings in the above-entitled matter.

9

10         Dated this 10th day of September 2014.

11

12

13                        *Briana L. Nesbit*
                          _____
14                        Briana L. Nesbit, RPR
                          Official Court Reporter

15

16

17

18

19

20

21

22

23

24

25

        USA v. Ider Matos  -- Sentencing  -- 5/16/2014